UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA     :
                              :     CRIMINAL ACTION
      v.                       :
                              :     No. 25-CR-20102-RAR
JOSE GAMEZ-MARAVILLA     :
_____ :

## <u>UNOPPOSED EMERGENCY MOTION TO STAY PROCEEDINGS[1]</u>

Comes now, JOSE GAMEZ-MARAVILLA, Defendant in the above-styled

action, by and through undersigned counsel, and submits this unopposed emergency

motion to stay proceedings in light of the United States government shutdown.  In

support of this motion, Mr. Gamez-Maravilla shows as follows:

(1)

Mr. Gamez-Maravilla is one of three defendants named in a single count

indictment charging him with murder in the aid of racketeering activity in violation

of 18 U.S.C. § 1959.

(2)

Murder in aid of racketeering carries a potential punishment of life in prison

without parole or a death sentence

---

[1] A large portion of this motion was adopted from a similar motion drafted by counsel
for co-defendant, Wilber Nararro-Escobar.  Rather than moving to adopt that motion,
counsel for Mr. Gamez-Maravilla have particularized Mr. Navarro-Escobar's motion.

(3)

The government alleges that Mr. Gamez-Maravilla was an associate of MS-13

when he and others killed someone suspected of being a rival gang member.

(4)

It is alleged that Mr. Gamez-Maravilla is not legally in the United States.

(5)

On January 20, 2025, President Trump signed an Executive Order titled

"Restoring the Death Penalty and Protecting Public Safety.  In that Executive Order

is the directive:

> (b) In addition to pursuing the death penalty where possible, the Attorney
> General shall, where consistent with applicable law, pursue Federal
> jurisdiction and seek the death penalty regardless of other factors for every
> federal capital crime involving:
>
> > (i)  The murder of a law-enforcement officer; or
> >
> > (ii) A capital crime committed by an alien illegally present in this
> > country.

(6)

It is likely that this case will ultimately be a capital trial.

(7)

Because of the potential for a death sentence has appointed Learned Counsel in

this case.  (Doc. 55).

(8)

Original Learned Counsel was permitted to withdraw and on August 22, 2025,
undersigned counsel, Jeffrey L. Ertel, was substituted as Learned Counsel (Doc. 89).

(9)

As a consequence of earlier Learned Counsel's withdrawal, current counsel had
to locate a new mitigation specialist, which they have done.

(10)

Because current Learned Counsel is in the process of becoming familiar with
the discovery and issues surrounding the case, and because there has been no
mitigation investigation started, this case is in its infancy and considerable time and
expenses must be committed to the defense.

ARGUMENT AND AUTHORITY

A.    Introduction

October 1, 2025, the government of the United States shut down.  As a result of
that shut-down, the defense is severely hampered in preparing Mr. Gamez-Maravilla's
defense.  Mr. Gamez-Maravilla was declared indigent, therefore his lawyers are court-
appointed and paid under the Criminal Justice Act (CJA).  The support team that
defense counsel must amass will also be reliant on payments via the CJA.  Even
before the shutdown, on July 3, 2025, the Federal government ran out of money to pay
CJA attorneys and expenses.  It was anticipated that those CJA vouchers pending on

3

October 1, 2025, would be paid, and CJA attorneys would again be paid for the work they performed.  However, the shutdown means there is still no CJA funding and will be none for the foreseeable future.

This "gap" in funding denies Mr. Gamez-Maravilla the rights guaranteed to him by the Fifth, Sixth and Eight Amendments to the United States Constitution. Because of the United States Government's inability to fund his defense, Mr. Gamez-Maravilla, pursuant to the Sixth and Eighth Amendments to the United States Constitution, *Gideon v. Wainwright*, 372 U.S. 335 (1963), *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Criminal Justice Act (CJA), 18 U.S.C. § 3006A and 18 U.S.C. § 3005, respectfully moves this Court for an immediate stay in this death penalty prosecution.

B.    Background

On July 3, 2025, the federal government ran out of funds to compensate CJA attorneys and experts.  As a result, Mr. Gamez-Maravilla's defense team have been compensated for work performed on this case.  Even without funding, counsel for Mr. Gamez-Maravilla have continued to work on his case.  However, the lack of funding has hampered counsel's ability to hire necessary experts.  Similarly, no investigation can be undertaken without the mitigation specialist and/or investigator incurring significant expenses that, because of the lack of CJA funding, might not be reimbursed for a lengthy period of time.  Thus, the most critical aspect of the defense,

4

mitigation investigation, has not begun, nor is it likely to begin in the near future.

The remedy sought by Mr. Gamez-Maravilla is warranted. As an example, the

Department of Justice itself has indicated that in civil cases:

> Civil litigation will be curtailed or postponed to the extent that this can be
> done without compromising to a significant degree the safety of human
> life or the protection of property. Litigators will approach the courts and
> request that active cases, except for those in which a delay would
> compromise to a significant degree the safety of human life or the
> protection of property, be postponed until funding is available.

U.S. Department of Justice FY Contingency Plan.[2] If the Department of Justice

believes that civil litigation should be postponed due to a lack of funding, it is surely

axiomatic that a case in which Mr. Gamez-Maravilla's life is at stake should be

delayed until adequate funding is available.

C. Mr. Gamez-Maravilla is Guaranteed the Right to a Meaningful Defense
Under the Sixth Amendment to the Constitution of the United States

The Sixth Amendment guarantees that: "In all criminal prosecutions, the

accused shall enjoy the right … to have the Assistance of Counsel for his defense."

U.S. Const. amend. VI. *Saee*, *also*, *Gideon v. Wainwright*, 372 U.S. 335, 339–40

(1963).

The Court has held that criminal defendants are not only guaranteed the right to

counsel but entitled to effective representation and provided access to the tools

necessary for a meaningful defense. *See Ake v. Oklahoma*, 470 U.S. 68, 76 (1985). As

---

[2] Available at https://www.justice.gov/jmd/media/1377216/dl (last visited October 3,
2025).

the Court unequivocally explained in *Ake*:

> *a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.* Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. *To implement this principle, we have focused on identifying the basic tools of an adequate defense or appeal, and we have required that such tools be provided to those defendants who cannot afford to pay for them.*

*Id*. at 77 (internal citations omitted) (emphasis added).

      1.  Mr. Gamez's Defense Team Cannot Provide the Representation Demanded by the Sixth Amendment

A person indicted in federal court for any death-eligible offense is entitled to appointment of two attorneys, at least one of whom must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Judicial Conference policy is that "[o]rdinarily, 'learned counsel' should have distinguished prior experience in the trial, appeal, or post- conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co- counsel, will assure high quality representation." Recommendation 1(b), Subcommittee on Federal Death Penalty Cases, Committee on Defender Services Judicial Conference of the United States, Federal Death Penalty Cases:  Recommendations Concerning the Cost and Quality of Defense (approved September 15, 1998).

An essential aspect of death penalty defense litigation and the "high quality legal representation" required in capital cases is the building and use of a dedicated and well-functioning team of professionals from various fields. In addition to counsel, the team must include, at a minimum, one or more mitigation specialists, fact investigators, and one member who is able, by experience and training, to screen for the presence of mental or psychological disorders or impairments. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003), Guideline 10.4. ("ABA Guidelines").[3]

2.  The Eight Amendment Recognizes that "Death is Different" Consequently Death Penalty Cases are Held to a Heightened Standard of Reliability

The fundamental truth that "death is different" is a bedrock principle of our criminal jurisprudence which "is always a consideration in the handling of death [penalty] cases." *Buntion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008). Accordingly, the Supreme Court has "imposed protections [in death penalty cases] that

---

[3]  The Judicial Conference of the United States has endorsed these guidelines in its October 2016 Model CJA Plan. See Guide to Judiciary Policy, Vol. 7A, Appx. 2A: Model Plan for Implementation and Administration of the Criminal Justice Act, XIV.B.9: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.) and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases." Id. at 28 (adopted by the Judicial Conference of the United States, Oct. 3, 2016; available at: https://www.uscourts.gov/sites/default/files/document/guide-vol07a-ch02-appx2a.pdf).

the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 993 (1991).

A foundational protection is that of "heightened reliability." *Woodson v. North Carolina* (1976) 428 U.S. 280, 305. (Powell, J.) ("Because of that qualitative difference [between a sentence of life and death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"). Simply stated, "[t]he finality of the death penalty requires 'a greater degree of reliability' when it is imposed." M*urray v. Giarratano*, 492 U.S. 1, 8-9 (1989) (internal citation omitted).

Another foundational protection in capital cases is the requirement for individualized sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In *Lockett*, the Supreme Court observed that because "the imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases . . . [and] far more important than in noncapital cases." *Id.*

Thus, both the Constitution and the Federal Death Penalty Act require that the jury may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). *See, also,* 18 U.S.C. § 3592(a) (providing that the sentencing jury "shall consider any mitigating factor, including the following [seven specific factors

and a 'catch-all' factor]"); *See also Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"). The Supreme Court has recognized that in death penalty cases there are "potentially infinite mitigators." *Ayers v. Belmonte*, 549 U.S. 7, 21 (2006). *See also Woodson*, 428 U.S. at 303-04 (emphasizing "the diverse frailties of humankind."); *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986) (defining mitigation as "anything which might lead a reasonable juror to conclude that life is the appropriate punishment").

Reliable investigation of a client's background, character, life experiences (including trauma), and mental health is "axiomatic in the defense of a capital case." *United States v. Bowers*, 18-cr-00292-DWA (W.D. Pa.), Doc. 404-3. Investigation is an integral part of the defense function generally. *See* American Bar Ass'n STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980), Standard 4.4-1, 4:53 ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."); *see also id*. at 4:54 ("Facts form the basis of effective representation."). Both the standards for practice and Supreme Court precedent establish the centrality of a robust investigation in a death penalty defense. The ABA later developed guidelines specific to capital defense practice, which courts have regularly applied in assessing the reasonableness of counsel's performance. *See*

9

*Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (citing cases) ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . .'"). The Supreme Court has called these guidelines "valuable measures of the prevailing norms of effective representation." *Id*. at 367.

The Supreme Court has recognized that it is essential for counsel in death penalty cases to ensure that a comprehensive mitigation investigation be conducted. *See Williams v. Taylor*, 529 U.S. 362, 395-99 (2000); *Wiggins v. Smith*, 539 U.S. 510, 535-38 (2003); *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005); *Porter v. McCollum*, 558 U.S. 30, 39-44 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945, 948-56 (2010) (per curiam).

Because death is different, "so too are the lengths to which defense counsel must go in investigating a capital case." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (citations omitted). Counsel must exhaustively explore every aspect of the "defendant's character ... and any of the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Wiggins*, 529 U.S. at 396 (reversing based on counsel's failure to "fulfill their obligation to conduct a thorough investigation of the defendant's background.").

To meet these fundamental capital defense practice standards, the ABA Guidelines require comprehensive records collection and multiple in-person meetings

with clients and witnesses in both fact and mitigation investigation. *See* American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines") Guideline 10.7; American Bar Ass'n, Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008) ("Supplementary Guidelines"), Guideline 10.11. Specifically, Supplementary Guideline 10.11 addresses the "requisite mitigation functions of the defense team," which include:

> • undertaking an "ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record…or other factors which may provide a basis for a sentence less than death" 10.11(B);
>
> • conducting "in-person, face-to-face, one-on-one interviews" with biopsychosocial history witnesses or any witness "who would support a sentence less than death,"
>
> • "[m]ultiple interviews [which] will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation" 10.11(C);
>
> • uncovering comprehensive documentary evidence of the client's biopsychosocial history for counsel's use, 10.11(D);
>
> • aiding counsel with the selection and preparation of testifying witnesses, lay and expert, 10.11(E);
>
> • gathering documentary support for lay and expert witness testimony, including biopsychosocial history records, 10.11(F), and aiding counsel in gathering and preparing demonstrative evidence that "humanize the client or portray him positively" 10.11(G). "The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." Guideline 10.7 cmt.6.

Many topics that must be explored in a mitigation investigation are highly

sensitive. A competent mitigation investigation will invade often shameful family secrets like mental illness, substance use, domestic abuse, sexual abuse, and trauma. A mitigation investigation can be a prolonged invasion into the privacy of a client and those close to him or her. To obtain reliable mitigating evidence, the mitigation specialist must treat potential witnesses professionally, recognize and respect the barriers at play, and commit the time it takes to gain their trust and develop rapport. Rapport is developed through multiple, in-person meetings with witnesses. A single meeting is rarely sufficient. Rather, "multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation." Supplementary Guidelines 10.11(C).

Because of the timing of the change in Learned Counsel and the amassing of the defense team, there has been no mitigation investigation in Mr. Gamez-Maravilla's case.  At the present time, and for the foreseeable future, because of the lack of funding, the mitigation investigation so critical to the defense is put on hold because the defense continues to be unable to pay mitigation specialists. While the Court may be able to pay for flights, all other expenses fall upon the mitigation specialist.  As Mr. Gamez-Maravilla was born and raised in El Salvador, a large number of witnesses and therefore a considerable amount of investigation must be conducted there.  Rental cars, hotels, meals and other assorted expenses will fall upon the mitigation specialist.  As these trips to El Salvador will, by definition, encompass

a significant number of days, if not weeks, the expenses associated with such trips will be enormous.  With no solution to the funding problems on the horizon, the defense team cannot afford to fund necessary investigation.  Similarly, without funding the team continue to meet with critical mitigation witnesses, or pursue and digest records, or engage in numerous other mitigation investigation tasks.  Mr. Gamez-Maravilla's defense is unconstitutionally prejudiced because of this lack of resources.

3.  Mr. Gamez-Maravilla is not able to Retain Necessary Expert Services

Another way in which the lack of funding is prejudicing Mr. Gamez-Maravilla is his counsel's inability to retain and pay experts. The defense team has identified, vetted, and met with several experts who are critical to his defense, but because of the lack of CJA funds, the defense team is not able to move forward with retaining these experts. Without funding, the defense team also lacks the ability to pay the experts it has already hired for their work.

The continuation of this prosecution is constitutionally intolerable as long as there is no funding for defense counsel and defense experts. Congress's failure to fund Mr. Gamez-Maravilla's defense means a deprivation of his right to counsel while the government seeks his death. A stay of the proceedings is required until funding for CJA is adequately restored.

D.  A Stay is the Appropriate Remedy

"Cases involving Sixth Amendment deprivations are subject to the general rule

that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison,* 449 U.S. 361, 364 (1981). The approach taken by the courts "has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id*. at 365. "[T]he constitutional infringement identified" must threaten or present "some adverse effect upon the effectiveness of counsel's representation" to warrant a judicial remedy. *Id.*

In this case, the prejudice Mr. Gamez-Maravilla is patent.  He is at a critical stage in the preparation for a trial at which his life will literally be at stake.  Yet he cannot do the things necessary to prepare a defense.  Defense counsel is expected to represent Mr. Gamez-Maravilla without compensation and without the ability to conduct a thorough investigation or consult with adequately funded and necessary experts. Counsel and experts are expected to shell out several hundred dollars a day to meet with the defendant and mitigation witnesses who are located in both the United States and Central America.  These are not abstract grievances or inconveniences; these are violations of his Constitutional rights.

Indeed, the core of the Sixth Amendment, *Gideon v. Wainwright*, and the CJA is the right to a meaningful defense; however, a defense can only be meaningful if it is funded. The CJA funding crisis and subsequent government shutdown are resulting in

constitutional injury with direct and adverse effects on counsel's ability to render effective assistance. A system in which CJA counsel and CJA service providers are expected to bankroll the criminal defense of federally prosecuted clients from personal business funds or by going into debt is fundamentally incompatible with the promises of the Sixth Amendment. Allowing Mr. Gamez-Maravilla's prosecution to proceed under these conditions impermissibly places his constitutional rights at the mercy of the government's self- created funding crisis. If the United States chooses to seek the death penalty against defendants, like Mr. Gamez-Maravilla, who are financially unable to obtain counsel and retain experts on their own, it must also fund the means for those defendants to meaningfully defend themselves. *See* U.S. Const. amend. VI; *Gideon*, 372 U.S. 335 (1963); *Ake*, 470 U.S. 68 (1985); and CJA 18 U.S.C. § 3006A.

This Court has the authority and the obligation to fashion relief that neutralizes the infringement on Mr. N Gamez-Maravilla's Sixth Amendment rights. Given the United States' continuing failure to adequately fund the CJA, the appropriate remedy is an immediate stay of all proceedings. The prosecution cannot continue while Mr. Gamez-Maravilla's defense is unable to function effectively due to lack of resources.

Even the Government recognized that "[t]his Court has the inherent authority and broad discretion to stay proceedings on its docket for good cause."" *United States v. Gregory Bush*, 3:18-cr-00188 Motion by the Government to Stay Proceedings, ECF

9 at 3-4.[4]

E.  Conclusion

Because the CJA funding crisis and subsequent shut down of the federal

government denies compensation for essential members of the defense team and

interferes with the defense's ability to retain and compensate necessary experts, Mr.

Gamez-Maravilla is being deprived of a meaningful defense in violation of the Sixth

Amendment, *Gideon v. Wainwright* and its progeny, and the Criminal Justice Act.

Accordingly, the Court should immediately stay all proceedings until funding for CJA

counsel and experts is adequately restored.

F. Certificate of Good Faith Conferral

Undersigned counsel, Roger Cabrera, conferred with Assistant United States

Attorney Brian Dobbins, who indicated that the government does not oppose the stay

---

[4] The government went on to argue, in federal cases with at least one capital charge, courts regularly stay proceedings or continue trial during the pendency of the Capital Case Review Process. See *United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008) (finding continuance appropriate in part because time was "needed for the Capital Case Unit to decide whether to seek the death penalty against [defendants], including time for the defendants to make mitigation submissions to the Department of Justice"); *United States v. Murillo*, 288 F.3d 1126, 1132 (9th Cir. 2002) ("[T]he continuance was proper to complete the death penalty evaluation process and to allow for additional preparation time, given the complexity of the case.")..delay of proceedings during the Capital Case Review Process enabled the unpressured compilation and submission of mitigating information (including the submission of additional material on behalf of [the defendant] at the request of the government) and consideration of such material by the United States Attorney and the Attorney General and their respective committees")

sought in this Motion.

Respectfully Submitted,

| | |
|---|---|
| The Mendelsohn Ertel Law Group, LLC | ROGER CABRERA, P.A. |
| 101 Marietta Street, NW | Wells Fargo Center |
| Atlanta, GA 30303 | 333 SE 2nd Avenue, Suite 2000 |
| Tel: 404-885-8878 | Miami, Florida 33131 |
| Email:      jeffrey@tmelg.com | Email:      roger@cabrera.legal |

*/s/ Jeffrey Lyn Ertel*

JEFFREY LYN ERTEL

GA Bar # 1096060

*/s/ Roger Cabrera*

ROGER CABRERA, ESQ.

Florida Bar No. 0148740

*Attorneys for JOSE EZEQUIEL GAMEZ-MARAVILLA*